HOFFMEYER, Plaintiff, v. OHIO TURNPIKE COMMISSION, Defendant.

Common Pleas Court, Cuyahoga County.

No. 702987. Decided April 14, 1960.

Belkin, Barnett-Kent & Shapiro, Cleveland, for plaintiff.
Johnson, Weston, Blackmore, Cory & Hurd, Cleveland, for defendant.

## OPINION

By JOSEPH H. SILBERT, J.:

Defendant, The Ohio Turnpike Commission, has filed a motion for summary judgment in opposition to plaintiff's claim that the Commis-

sion is responsible for an alleged unprovoked assault by its employees on the person of the plaintiff while a customer at a Turnpike Service Plaza. For the purposes of this discussion, the Court will assume that the employees acted within the scope of their employment. In support of its motion, The Ohio Turnpike Commission alleges that it is immune from liability for personal injuries inflicted negligently or intentionally by its employees. Consideration of the nature of the Turnpike Commission is essential to an intelligent analysis of the question of immunity. In the words of the Legislature, §5537.02 R. C., the Commission "is a body both corporate and politic in this state" engaged in the performance of "essential governmental functions." This statement by the Legislature hints at the dual nature of the Turnpike Commission. Its close relationship to the state is represented by the fact that the Commissioners are appoined by the Governor, and that the Director of Highways is an ex officio member of the Commission, as well as special exemptions, §5537.02 R. C. The first such exemption, is that Turnpike bonds issued to finance the project "need not comply with any other law applicable to the issuance of bonds," §5537.10 R. C. Sec. 5537.20 R. C., provides an additional special privilege. Since the Commission is regarded as performing a special governmental function, it "shall not be required to pay any taxes or assessments upon any turnpike project or upon any property acquired or used . . ." A final tie to the state is the provision that when the debt and interest of the revenue bonds has been discharged, the turnpike is to revert to the State Highway Commission and to be maintained and operated by them as a free road, §5537.21 R. C.

On the other hand, the Turnpike Commission has many attributes of a private corporation. The most significant of these is the state's clear disclaimer of all financial responsibility for the operation of the road and the discharge of its bonds. The words used in the sections give rise to the clear inference that the Legislature did not regard the Turnpike Commission as a political arm of the state. In §5537.11 R. C., the Legislature recited:

"All such turnpike revenue bonds shall contain . . . . a statement to the effect that the bonds, as to both principal and interest, are **not an obligation of this state or of any political subdivision thereof.**" (Emphasis added.)

Such sections do not authorize the Commission to incur "indebtedness or liability on behalf of or payable by the **state or any political subdivision thereof.**" **Id.** (Emphasis added.) The implication that at this time the Turnpike is not part of the State Highway System is equally clear in §5537.21 R. C., which asserts as mentioned that when the obligations have been discharged, the turnpike "shall become a part of the State Highway System, . . . . ." The broad powers reposing in the Commission such as the power to contract, §5537.13 R. C.; the power to issue bonds, §5537.08 R. C.; the power to purchase property, §5537.07 R. C.; and appropriate property and rights of way, §5537.06 R. C.; the power to enact by-laws, rules and regulations "for the control and regulation of traffic. . . . for the protection and preservation of property. . . .

and for the maintenance and preservation of good order. . . ." **Sec. 5537.16 R. C.,** affirm the autonomous nature of the Turnpike Commission. Consideration of the Commission's structure reveals that it is a hybrid creation of the state carrying out state functions with an interlocking directorate providing the state with residual control and yet with an independent being of its own.

The question of the applicability of governmental immunity to this hybrid is not completely resolved by these enacting statutes. The state has charged the Commission with specific obligations such as the maintenance, repair and operation of the Turnpike and the compensation out of Turnpike funds for the damage to all "public or private property. . . ." **Sec. 5537.17 R. C.** Coupled with these specific responsibilities are: 1) the general statement that it can "sue and be sued in its own name. . . ." **Sec. 5537.04 (D) R. C.;** and more significantly, 2) the admonition that though the activities shall be essential governmental functions, **"the Commission shall not be immune from liability by reason thereof."** Sec. 5537.02 R. C. (Emphasis added.)

Two issues are raised by these facts: 1) is the Ohio Turnpike Commission an instrumentality of the state clothed with sovereign immunity or is it an independent legal entity subject to suit? and 2) If an entity and subject to governmental immunity, do the general statements waiving that immunity and permitting suit, subject the Commission to unrestricted liability in tort?

The first issue for consideration is whether the Turnpike Commission of Ohio is an agency of the state or an independent entity. As a general rule, if a commission created by the state is considered an entity, it is not clothed with the traditional sovereign immunity although such immunity attaches to an agency of the state. The test used to determine entity and therefore liability is whether or not state funds would be subjected to the payment of the judgment in the event the Commission is found liable. The rationale for this distinction is found in People v. Illinois State Toll Highway Commission, 120 N. E., 2d 35, 40 (1954). The Court explained:

". . . the state assumes no liability upon the bonds issued by the commission or upon any other contractual obligations which it incurs. Whatever effect a recovery of damages against the commission would have upon general, tax-derived revenues of the state is limited to the remote right which is given the state to receive any surplus remaining from the commission [when it] is ultimately dissolved."

Similarly, in Eastern Motor Express v. Espenshade, 138 Fed. Supp. 426, 431 (D. C. E. D. Penn. 1956), the Court found that due to the complete isolation of the financial operation of the Pennsylvania Turnpike from that of state funds "that the Commission is a separate entity, distinct from the Commonwealth of Pennsylvania not clothed with any immunity, . . ." Following this reasoning, the Federal Court of the Western District of Pennsylvania found in Linger v. The Pennsylvania Turnpike Commission, 158 Fed. Supp. 900 (D. C. W. D. 1958) that the commission may be held liable for personal injuries sustained by the occupant of an automobile resulting from the negligent conduct of

Turnpike employees in the construction and maintenance of the road. Therefore, under the entity theory a public authority may be found liable for its torts.

The authority of the foregoing rule is, however, minimized by the case of Masse v. The Pennsylvania Turnpike Commission, 163 Fed. Supp. 510 (D. C. E. D. 1958). Constrained to follow Pennsylvania county decisions, the Federal District Court found the Turnpike Commission immune from liability for personal injuries. While the court admitted the premise of the preceding case that the decisions of the court of the County of Dauphine did not constitute a concensus in the United States, it felt that the local decisions were compelling in that the Pennsylvania Turnpike Act provided for exclusive jurisdiction of cases involving the Turnpike Commission in the Court of Dauphine County. The District Court then reasoned with the Pennsylvania Common Pleas Court that the Commission was a "quasi public corporation and, as such, . . . . an instrumentality of the commonwealth engaged in the performance of a particular governmental function. . . ." p. 512 (citing Frye v. Commission, 53 Dauphine Co. Pa. 38—1942). They concluded, therefore, that in the absence of an express legislative imposition of liability for personal injuries, that the immunity of the state shields its instrumentality, the Turnpike Commission. The determination that a commission engaged in a governmental function is an agency is supported in Petty v. Tennessee-Missouri Bridge Commission, 254 F. 2d 857 (Ct. App. 8th Circ. 1958). The organization of the Tennessee-Missouri Bridge Commission was much the same as that of the aforementioned Pennsylvania and Ohio Turnpike Commissions. In considering the Commission an agency of the state, the Court emphasized the attributes of the Commission which bound it to the respective states. The opinion relates:

"The defendant Commission was the agency or instrument of the two States and not an entity separate and apart from the States. The Commission could issue no stock. It was controlled by state officials appointed by the respective Governors with Senate confirmation. Commission action could be authorized only upon a majority vote of the Commissioners. . . . Veto power was reserved to the governors. The Commission's authorized bonds were granted exemption from income taxation. Its revenue from tolls could only be used for reasonable operating expenses and for payment of its bonds and interest, and when the indebtedness was paid the bridge was to belong to the two states . . . ." **Id.** p. 859.

It is clear that the conflicting court opinions regarding the status of a public commission arise out of its hermaphroditic nature. In the latter case, the Court emphasized its restraints and subservience to the states and found it merely an agency. Previously enumerated cases found the commission independent of the state emphasizing its complete financial freedom and its broad autonomous powers within its jurisdiction. Just as the courts are in disagreement as to which physiological characteristics determine its "sex," they are in disagreement as to the effect of the imposition of liability on the Commission on the

state itself. The latter case extending immunity expressed the fear that "a judgment against the Commission and a seizure of the ferry would adversely affect the participating states in the performance of their duty of providing a means of crossing the river." **Ib.** p. 860. On the other hand, cases waiving the immunity emphasized the extremely remote effect of the depletion of the independent funds of the Commission on the finances of the state.

In view of the conflict in court jurisdictions and in the absence of compelling state authority, this Court is free to make its own determination regarding the status of the Ohio Turnpike Commission. Without reiteration of the many facets in **Chapter 5537 R. C.**, which reflect the autonomy of the Commission in the administration of the Turnpike, its removal from state funds and state financial responsibility and even its inferential separation from the public highways and public functions of the state, this Court concludes as did the Federal Court of Appeals of the Sixth Circuit in Harrison Construction Company v. Ohio Turnpike Commission, 272 F. 2d 337 (Dec. 1959) that the Ohio Turnpike Commission is an "autonomous entity" and that, therefore, the traditional immunity inuring to the sovereign does not shield the Commission from liability.

Since the Turnpike Commission may be considered an entity, the legislative mandate that the commission may be sued in its own name coupled with the general waiver of immunity from liability resolves beyond a doubt its liability. In **Fowler v. The City of Cleveland, 100 Oh St 158 (1919)**, the supreme court decisively settles this point. It found the 1912 amendment to **Article I, Section 16, Ohio Constitution**, providing that suits may be brought against the state in the courts and in the manner to be provided by law to constitute a surrender of governmental immunity. Labeling the municipality as "a body corporate, as well as a body politic," the same terms used by the Legislature to describe the Ohio Turnpike Commission, §5537.02 **R. C.**, the court summarized with the following meaningful and prophetic words:

"The provision that it may sue and be sued does not create any new liability. But the conception of public policy under which the municipality as a subdivision of the sovereign power could not be sued has long been abrogated." p. 167.

The court further explains that statutes "permitting municipal corporations to sue and be sued are, of course perfectly consistent with the amendment to the constitution above referred to, and, therefore, legally provide the manner and method of bringing suit against municipal corporations." p. 168. The court adds that such liability is limited to common law liability within our system. Therefore, according to the Ohio Supreme Court, the "sue and be sued" provision is adequate to abrogate immunity.

However, it has been said repeatedly that a statute creating a liability against a public authority where none previously existed is in derogation of the common law and must be construed strictly and should not by implication be found to permit general liability in negligence, **Dunn v. Brammer, 102 Oh Ap 89 (1956)**. This general restrictive maxim, while widely recited, is in conflict with the thinking of the Ohio Su-

preme Court in the Fowler case, supra, as well as cases representing an equally realistic approach to immunity. Construing a similar statutory waiver of immunity, a Louisiana Court in Duree v. State, 96 So. 2d 854, 860 (1957) found for example, "that such enactments should be liberally construed to accomplish the legislative intention." The reasoning of the Fowler case is reiterated in Taylor v. New Jersey Highway Authority, 126 A. 2d 313, 322 (1956). In that case, the court explained that when states "entrust to independent Authorities, functions which necessitate relationships comparable to those ordinarily existent between private parties," the authority should not be afforded immunity of the state. Referring to the application of the "sue and be sued in its own name" clause, the court cited Cardozo in Anderson v. John L. Hayes Construction Company, 243 N. Y. 140, 147, 153 N. E. 28, 29 (1926):

"The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced."

In Kaufman v. City of Tallahasse, 94 So. 698, 699 (1923), the Florida Supreme Court accredited the thinking of the Fowler case and went even further. The court found a municipality under the commission form of government liable for personal injuries sustained by a pedestrian due to the negligent operation of a municipal fire truck "in view of the modern thought as expressed in the commission plan that a city is merely a large quasi public corporation whose activities partake more of the nature of a business than a government." Like the Fowler case, the reasoning of the court and its explanation of the nature of the governmental function today is particularly applicable to the liability of a commission for the maintenance and construction of a toll road. The court reasoned that a city is more and more a business engaged in the "proprietary management of local public interests . . . . which are managed for the financial advantage and profit of the city;" such as electric lighting, sewage disposal systems and water works. The court all but abolished the distinction between governmental and proprietary activities alleging that the real issue in view of the changing nature of government was whether or not the community fell below the ordinary standards of care in carrying out its functions. Certainly, a modern approach to immunity would all but negate the styling of the Commission's activities as "essential governmental functions" respecting immunity from liability to private citizens. Therefore, due both to the independent nature of the commission and the explicit waiver of immunity, The Ohio Turnpike Commission is liable in tort as is a private corporation.

However, the label still has meaning when used to obtain for the turnpike commission and its activities special exemptions in its relationship to the parent state. The most significant of these is the exemption from taxation of property which was recently upheld by the Ohio Supreme Court, Carney v. The Ohio Turnpike Commission, 167 Oh St 273, 147 N. E. 2d 857 (1958), although the property in this case, portions of a service plaza, was on lease to private persons. While this decision might at first seem contradictory to the waiver of immunity from

liability which potentially could result in the award of large sums of money to private persons, it must be remembered that the tax exemption is specified by the Legislature as explicitly as is the waiver of immunity from suit.

Moreover, even had governmental immunity been applicable to the turnpike commission, the activity in question could still have been considered a proprietary function, thereby subjecting the commission to liability. In Eastern Motor Express v. Espenshade, 138 Fed. Supp. 426, at 430 (D. C. E. D. Penn. 1956), the court considered the test distinguishing governmental functions from corporate functions as "whether the act performed is for the common good of all, that is, for the public good, or whether it is for the special benefit or profit of the corporate entity." The court then found that the negligence of an employee of the Turnpike Commission in the act of maintaining the turnpike was "for the special benefit or profit of the Commission, for if the turnpike is not kept in repair fewer motorists would use it and the result would be a loss of revenue." Id. p. 430.

In Fowler v. The City of Cleveland, 100 Oh St 158, 160 (1919), the court engaged in a perceptive analysis of the distinction between governmental and proprietary and its effect on a municipality's liability, terming the area of governmental function a "vague and uncertain sphere." Discussing the broad extension of activities by the government, the court exposed the timely policy underlying the distinction between governmental and proprietary activities. It recited:

". . . . a municipal corporation has now come to be a dual entity. It is no longer a mere subdivision for the expression of the sovereign will . . . . but it has entered the field and does the things that were formerly done by private persons . . . . and no reason is apparent, why, in the respects in which it entrusts purely ministerial duties to agents and employees it should not be subject to the liabilities of such persons and companies." p. 164.

Explaining that the difficulty of drawing the line between that which is governmental and that which is corporate is due to "the persistence of antiquated and outworn terminology," the court lays down the test as "Where a municipality [whether termed a governmental agency or a body corporate] with the sanction of the state has assumed the performance of a work or industry or enterprise formerly carried on by the citizenship, that of itself, so far as its practical operation is concerned, stamps it as a corporate or ministerial work." p. 170.

In the light of the test applied by the Ohio Supreme Court in the Fowler case, supra, as well as the Espenshade case, supra, considering certain activities by turnpike commission to be proprietary, it is obvious that employees of the turnpike commission engaged in the operation and maintenance of a service plaza could be deemed participating in a corporate rather than a governmental facet of the turnpike commission's activities. Surely this activity could be carried out, and is normally carried out by private citizens subject to liability. Moreover, the maintenance of a plaza while not essential to the operation of a limited access throughway provides additional convenience to motorists

thereby encouraging their use of the road, increasing turnpike revenues and insuring its financial success. Therefore, such an activity could be considered of special benefit to the turnpike commission and a proprietary activity.

While the decision could be founded on the aforementioned theory, this Court's ruling is akin to that of the West Virginia Supreme Court, which **declared** that the labeling of a function as "governmental" does not of itself give rise to a secondary governmental immunity since the doctrine of sovereign immunity does not clothe a financially independent entity in any activity, Hope Natural Gas Company v. West Virginia Turnpike Commission, 105 S. E. 2d 630, 637 (1958).

Therefore, this Court finds that the state has created, in The Ohio Turnpike Commission, a separate entity in furtherance of a broad public purpose encouraging its success through exemption from certain responsibilities which normally burden private citizens. However, inasmuch as the public funds of the state cannot be impressed with the obligations of the Commission, it has expressly divested the entity of any immunity that the state has from liability to its citizens. Had the Legislature intended to vest in the Commission immunity from tort liability, it would have done so specifically. To the contrary, the express waiver of immunity coupled with the power to sue and to be sued in its own name subjects the Turnpike Commission to such liability as is recognized within the body of law of this state.

In summary, the doctrine of sovereign immunity is an anachronistic remnant of the divine right of Kings. The historical supporting maxims of sovereign immunity, 'The King can do no wrong' and 'He who makes the laws shall not be subjected to them,' are no more than legal curiosities when countered by the foundation of our civil law that one suffering injury at the hands of another is entitled to compensation from the wrongdoer. The cabalistic distinctions between governmental and proprietary functions which have been used to ameliorate the harshness of the doctrine of governmental immunity are no longer useful in that they tend to obscure their original function. As the state extends the range of its services and increasingly engages in activities which might equally be undertaken by private individuals and corporations, the unreasonableness of shielding such enterprises with sovereign immunity becomes more apparent. Not only would the application of immunity in this case subvert the keystone theory underlying civil liability thereby derogating the right to compensation of injured persons, but it would impose an additional indirect burden on private enterprise engaging in competition with the public corporation in competitive media of transportation. In the words of the court in Hope Natural Gas Company v. West Virginia Turnpike Commission, 105 S. E. 2d 630, 640 (1958):

". . . : morality is just as much to be practiced by the state in its creation and operation of any separate entity for special purposes whether public or not, as the state demands and expects of its citizens, . . . ."

Motion for summary judgment denied.